I'm an attorney representing the appellants Pitch Black, Oil, LLC, Dustin J. Stuber, Suzanne M. Young, Douglas R. Hansen, and Laurie A. Hansen. Now, I'd like to use ten minutes of my time now and save five minutes for rebuttal. Rebuttal will be presented by Brandon Hoskins, the attorney for Appellant Whitetail Wave. Now, this appeal arises from a dispute over an overriding royalty interest. In late 2005, the appellant's predecessors and interests, whom I'll refer to as the Stuber Group, assisted Rocky Mountain Exploration in acquiring a number of oil and gas leases, which I'll refer to as the subject leases. The subject leases were acquired pursuant to an agreement with Rocky Mountain Exploration. In exchange for their assistance, Rocky Mountain Exploration assigned the Stuber Group overriding royalty interests in the subject leases. Quote, were any extensions or renewals thereof entered into within 180 days of expiration of the applicable lease? End quote. Prior to the expiration of the subject leases' respective five-year primary terms, three significant types of transactions occurred with respect to the interests covered thereby. First, the lessors under a number of the subject leases changed as a result of conveyances of or succession to the interests of the original lessors. Second, the lessees under the subject leases changed as a result of several conveyances, and to trace those briefly, Rocky Mountain Exploration conveyed an 80% net revenue interest in the subject leases to an entity called Tracker, and then Rocky Mountain later conveyed its remaining interest in the subject leases to Lario Oil and Gas. Tracker conveyed its interest in the subject leases to TRZ, whose interest was subsequently acquired by Hess, who ultimately acquired all of the interest of Rocky Mountain Exploration. And third and finally, beginning in 2009, Tracker and TRZ acquired leases from the lessors or their successors under the subject leases covering the same lands as the subject leases. Counsel, your time is running quickly and I have the leases in front of me. Sure. If I understand the assignment of overriding royalty interest, it's just this one paragraph, right? And it has no conditions at all, right? It's just the one paragraph sentence. And then if I look at the subject lease, there's no duty to produce here. It says the lessor agrees that lessees shall not be obligated in any way at any time to do any production at all. So you have to have a fiduciary duty, right, for this to work. You can't do it from the express terms of the contract. Well, I guess, yes, and we would argue that the case law that we've presented to this court specifically recognizes fiduciary duties in a couple of different circumstances. I know, but you've got my question. You've got to show a fiduciary duty, right? Because the naked terms don't do it. Well, I guess our argument would be, one, there is case law suggesting that a fiduciary duty may arise. No, no, no, I know that. You need a fiduciary duty, yes or no? Yes. Right? Okay, proceed. Now, I guess what we would point to in terms of or as support for our proposition that the North Dakota Supreme Court would recognize a fiduciary duty in this case are a couple of things. One, we would refer the court to this court's decision in a case called A&R Western Coal Development Company versus Basin Electric Power Cooperative. That case concerned a coal lease and an overriding royalty interest in a series of coal leases where the overriding royalty interest owner complained that he'd been deprived of royalties because of preferential mining practices by the lessee. Was that case in your brief? I don't believe the case was in our brief. Okay, send us a 28-J letter because that's a new one on us. Go ahead. And then, so reasoning by analogy to the North Dakota law that implies a duty of reasonable development in oil and gas leases in favor of a lessee, this court concluded, quote, the trend in North Dakota law strongly suggests that to protect royalty owners, an implied duty to develop will be found in mineral cases as well as oil and gas cases. Now, the court went on to discuss North Dakota's policy rationales for such an implied duty, noting that lessors have a property interest in oil and gas and a right to receive compensation that should be protected. Such policy rationales apply with even greater force to overriding royalty interest owners who have no mineral rights to fall back on if properties are not developed. Now, this court ultimately concluded that, quote, implying the duty to develop in favor of overriding royalty holders protects the same interests deemed worthy of protection in regard to lessors. Now, I'm not aware of North Dakota case law clarifying whether this implied duty to develop is a fiduciary duty per se, but the relationship from which it arises clearly falls within the definition of a confidential relationship as articulated by the Kansas Supreme Court in Howell v. Cooperative Refinery Association. Kansas is a fiduciary duty state, right, as is Oklahoma? Yep, yep. And in that Howell case, the court defined confidential relationship as, quote, a relationship between business associates that would lead an ordinarily prudent person in the management of his business to repose that degree of confidence in another which results in the substitutions of the other's will and judgment for his own. We would argue that that's the same situation that you have here and the same situation that you have under an oil and gas lease. Essentially, the Stuber Group, in agreeing with Rocky Mountain to acquire these leases for Rocky Mountain's benefit, accepted or subjected itself to the discretion of Rocky Mountain. What about the Grinberg case? We have very little North Dakota law, as you know, which says simply, the existence and scope of fiduciary duty depends upon the party's agreement. Sorry about that. And that's what I would say. Here, the contract's got nothing. Go ahead. And I would say that, you know, again, that's why I'm saying that I'm not aware of case law recognizing this implied duty as a fiduciary duty per se. However, you know, just because it hasn't necessarily been recognized as such doesn't mean that it isn't in the nature of a fiduciary duty. What about the Come Big or Stay Home case? Are you familiar with it? I'm familiar with that as well. It says there's no fiduciary duties in an oil and gas lease unless it says so. What about that case? I guess I would say that case has to be reconciled with the case law that we've discussed where the North Dakota Supreme Court has recognized an implied duty to develop. I would argue that this implied duty to develop is in the nature of a fiduciary duty. And I understand North Dakota's one of the few states that doesn't have a covenant of good faith and fair dealing in contracts, right? Yes, the North Dakota Supreme Court hasn't recognized that implied covenant. It says only in insurance contracts, right? Yes, that's what it says. Right, because many states, many of our states, every contract has a duty of good faith and fair dealing, no extra charge for that advice. Back to your argument. And I guess that I would point out that in light of that, the lack of that sort of protection, that's also why we think the North Dakota Supreme Court would recognize that overriding royalty owners are deserving of protection of some sort and would recognize, if not a fiduciary duty per se, then some sort of implied duty protecting overriding royalty interest owners, as this court recognized in its 2002 decision that I discussed earlier. You know, the facts of the present case bear this out. As I indicated, the Stuber Group reached this agreement with Rocky Mountain and in exchange for their services were conveyed the override. In making this agreement, the Stuber Group placed its trust in Rocky Mountain as lessee to either produce from the leases so as to maintain them in effect and generate revenue or to secure extensions or renewals until production thereon could occur. I would also point out that the North Dakota Supreme Court is likely to adopt the position that we're arguing over the position that Hess has presented because the case law relied upon by Hess borrows from ordinary landlord-tenant cases or is ultimately rooted in principles derived from ordinary landlord-tenant cases. In particular, the case of Mutual Paper Co. v. Hoag-Sprog Corp. seems to be, it's a 1937 Massachusetts case that seems to be at the root of the line of cases that goes through Sunak Petroleum, Williams Petroleum Co., Lilla Bridge, and ultimately to Sawyer. Now, the Mutual Paper Co. case just involved an ordinary landlord-tenant lease. As I explained, it says nothing about oil and gas leases, much less extension and renewal clauses in assignments of an overriding royalty interest. Now, this is significant under North Dakota law because the North Dakota Supreme Court has recognized that, and I guess the case would be it's Holman v. State. In that case, the court declined to rely on Louisiana oil and gas case law that borrowed principles from ordinary landlord-tenant law. The court stated that unless a different attention is clearly indicated, oil and gas leases are not and should not be governed by the law and policy applicable to ordinary landlord-tenant leases. Accordingly, this case law that adopts this restrictive interpretation of extension and renewal that Hess has relied upon. Also, in the 20 or so seconds you have left, what did the district court do wrong? The district court incorrectly concluded that the North Dakota Supreme Court would adopt this restrictive interpretation of extensions and renewals. We think that the more liberal or broader reading of the phrase extension and renewal that we've presented in the case law is what the court would adopt, in particular because of what I mentioned about recognizing implied duties or fiduciary duties to protect overriding wealthy interest owners. Thank you. Thank you. Mr. Hoskins? I'm sorry, Mr. Hoskins, it's going to take me a little while. Oh, I'm sorry. Mr. Forster? May it please the court, Paul Forster on behalf of Appalese Hess Corporation and Hess Bakken Investments to LLC. At its heart, this case presents a straightforward question of contract interpretation, and the district court approached it that way, correctly. The district court looked at the contract at issue and concluded that the top leases at issue in this case do not constitute, quote, extensions or renewals of the corresponding subject leases. Accordingly, the overriding royalty interest that appellants own in the subject leases, some of which are still held, by the way, they don't attach to the top leases. It's under the plain terms of the contracts, and so accordingly Hess would request that this court affirm the district court's conclusion. Let me ask you a question. Do you know about the Eighth Circuit cases that your opposing counsel began an argument with that I don't think is in the briefs, in your briefs or the other briefs? Your Honor, as I stand here, I'm not recalling that the ANR case was discussed in the briefs. I don't think it's in any of the briefs. I looked quickly. I don't think it's in any here. And insofar as, and to be frank, the appellants really didn't raise this implied duty of reasonable development in the district court level or in the appellate briefing. I think any argument based on that would be waived. But regardless, The plain terms of the contract act like there's no duty to develop anything. Right. I mean, the corresponding subject leases certainly, they contain surrender clauses. They state that there's no duty to develop. No duty to produce anything. There's no duty to produce anything. They're paid up leases, which means that they're paid up. Presumably a bonus is received at the outset. They're good for X number of years. And then they can be held if production is obtained. But do all the oil and gas stations imply a fiduciary duty? Pardon me again. Do all of the oil and gas producing states, Oklahoma, Texas, Kansas, do all of them, 10th Circuit, lot of 10th Circuit law, do all of them imply a fiduciary duty? No, I don't think so. Okay, tell the states that don't. Certainly Texas does not. I think if you look at the SUNIC line of cases, the SUNIC case specifically says that oftentimes when courts have looked at these extension renewal issues, they mix up the issues of constructive trust or fiduciary duty versus contract interpretation of the contract language, and it said we're going to address that separately. Well, what is the language in SUNIC that goes the other way, that talks about washouts and avoiding washouts? Sure, sure. And there is language in SUNAC that talks about washouts, but it doesn't suggest that it implies a fiduciary duty into the contract. Washout situations, you know, a washout I don't think is a cause of action, but typically a washout situation, you know, if there's really a true washout, it's probably going to involve causes of action such as fraud, collusion, that type of thing. A washout is not just any situation in which a original lease expires and then a new lease comes in. A washout is defined as the intentional surrender of the original lease, you know, and Hess could have done that. These leases had surrender clauses. There's no evidence that Hess surrendered any of these leases. It didn't. You know, it allowed them to, you know, they played out over the ordinary course of their life, and actually the record shows that some of these original leases were held by Hess's own drilling efforts. To get back, you know, in terms of development, the only evidence in the record is that Hess actually did develop some of these leases. Third parties, third party operators also developed some of these leases, and some of these subject leases were held either in part or in full by production at the end of their primary terms. But as to those tracts that weren't held by production, the subject leases expired in the ordinary course according to their own terms. They weren't surrendered. Well, am I right in what I'm reading here, that Kansas, Oklahoma, and most of these states do imply a fiduciary duty in the assignment of overriding lease interest? I would say that Oklahoma certainly implies fiduciary duty. Kansas, I think the PEDEX case, I don't read it to say that it implies a fiduciary duty, but rather a covenant of good faith and fair deal. Well, okay. But in terms of heightened duties. Sure. Yes. I think North Dakota law is certainly distinguishable from that because, as Your Honor noted, the North Dakota Supreme Court has repeatedly declined invitations to imply a covenant of good faith and fair dealing in non-insurance contracts. So consistently, in fact, that the District of North Dakota has recognized on a couple of occasions that a federal court sitting in diversity jurisdiction ought not imply a covenant of good faith and fair dealing. Did you cite those cases? Yes, Your Honor. Thank you. And just to throw a case out there, the WFND case out of the North Dakota Supreme Court I think is one of the more recent North Dakota Supreme Court cases that rejected an invitation to apply a covenant of good faith and fair dealing. It involved a- Beyond insurance. Beyond insurance. Exactly. And that case involved a contract in the real estate context. That case also, by the way, as an additional basis for rejecting the invitation, noted that the parties, the claimant had failed to plead a breach of the covenant. And that's the case here. There's no, you know, in North Dakota law, insofar as something like that would exist, it would be an independent cause of action. That wasn't pled here. The North Dakota Supreme Court in this Olson case cited in the brief also says that breach of fiduciary duty is a tort claim. It's an independent cause of action. It wasn't pled here. And so we go back to the plain language of the contracts and looking at those, you know, the court is left to, you know, look at the plain meaning of the terms extensions and renewals. And I think appellants here, you know, they stood up and forth rightly admitted at oral argument that the only way that they win is if the court implies some sort of fiduciary duty or heightened duty. Otherwise, they just can't get there on the face of the contract. Judge Hovland, you know, being very familiar with North Dakota law, took that into account, interpreted these contracts on their face according to the plain meaning, and then, you know, properly compared subject leases versus top leases, found that there were material differences. Top leases are not renewals or extensions of the subject leases because renewals and extensions, they're concepts closely allied to one another. What about where the Sandvik court cites these Kansas cases? Do you think, and they cite the Koontz oil and gas? You know the part I'm referring to. Yes, they specifically cite the Pedex case out of the Kansas Supreme Court. They do. And is that enough? Is that enough? No, Your Honor, and for a couple of reasons. I mean, first of all, that is a fiduciary duty case. It involved a joint venture. They cite the Pedex case for the, you know, it's, I think, dicta saying that, you know, and by the way, these are effectively extensions, see Pedex. But what they cite out of Pedex is that the top leases were effectively extensions where they involved substantially identical terms. What are the differences in terms that keep these top leases from being able to qualify as extensions? Certainly, Your Honor, there's a myriad of different terms, and they're laid out in detail in the brief. I think one of the most important is an increase in the landowner's royalty. There's different primary term lengths. There are differences in land use restrictions. Some of the leases contain different indemnity obligations. At least one of the groups of leases contains different royalty valuation terms. You know, it goes on and on. They almost all have the same secondary, it's called, I get a kick out of it, secondary term as long as oil is being produced. Yes. Right? Is that true at all of them? That's pretty much every oil and gas lease you'll ever see. You know, you're going to hold by production because that's an incentive, of course, for these oil companies who invest a huge amount of capital into drilling a well. You know, you're not going to have an oil company that drills a well to produce for 40 years and is going to want its lease to expire, you know, five years into production. And so that's something that you're going to find in pretty much every oil and gas lease. But then that term is controlled by how long the oil company wants to continue producing. It's not how long they want, but how long they do continue producing and paying quantities. It says no duty to produce. Sure, sure. We're talking past each other. Go ahead. They could give up. In any event, you know, getting back to your honors question about differences, there's a number of those different terms laid out in the briefs. There's also a difference in ownership, really, because these top leases, when they were taken, provided an opportunity for the lessee to increase its ownership interest because TRZ at the time that it took these top leases, they only owned 80% of the subject leases. And if the top leases, insofar as they were ultimately to vest, you would give them 100% ownership. They owned 100% of the top leases. And so in that sense, the ownership is different as well. In addition, there was new bonus consideration given for the top leases. That's been pointed to as an additional factor to, you know, to distinguish ways in favor of considering a top lease, a new lease as opposed to an extension or renewal. For instance, you know, that's discussed in the Lillibridge case. And so the district court correctly concluded that these top leases were new releases, not extensions or renewals. You know, to get around that, the appellants, again, they have to go to fiduciary duty, and we've kind of discussed that. I want to hit just briefly also on the fact that the appellants to try to get around the contract instruction based on the four corners, they also try to bring in various extrinsic evidence of intent. And, of course, none of the parties have really argued that the contracts are ambiguous. The district court, other courts such as Lillibridge, have interpreted extensions or renewals as unambiguous, clear, have interpreted as a matter of law. But, you know, the appellants have tried to import extrinsic evidence nevertheless. Extrinsic evidence in North Dakota, like most places, is not admissible to alter, vary, explain, or change the contract meaning. And so custom and usage evidence, like, you know, or course of practice evidence, that's also, you know, a form of extrinsic evidence under North Dakota law that can't be brought in to prove what the parties meant by extensions or renewals. So the appellants, you know, pointing to other agreements that the parties entered into, you know, simply it doesn't bear on interpreting the intent of extensions or renewals in this context. Moreover, Hess pointed out competing extrinsic evidence, even if, you know, even if the court were to find the contracting ambiguous, then the party's intent, I think, would become a question of fact. So, you know, in summary on that issue, the district court did correctly construe these as clear and unambiguous contracts, correctly concluded that the top leases do not qualify as extensions or renewals of the subject leases because they're just not sufficiently similar in terms or in circumstances. I want to touch just briefly on the alternative argument that we raised regarding the 180-day limitation. We raised that as an alternative basis for affirmance as to majority of the leases. If the court were to determine that any of those top leases did constitute extensions or renewals, no reason to reach that if the court simply affirms a district court. But the extensions renewals clause says that the override will apply to extensions or renewals, quote, entered into within 180 days of expiration of the applicable lease. So it contains a time limitation as well. The plain meaning of that term, within 180 days of, means any time during the period beginning 180 days before and terminating 180 days after expiration. You know, we cited a Ninth Circuit case that says that that is the ordinary meaning of the term unless the context specifically requires otherwise. And, you know, there's no reason not to apply the plain meaning of that term either in this case. You know, the appellants have argued that that construction is an illogical result, an absurd result. I don't, you know, there's nothing absurd about it. It's, you know, perfectly logical to think that in a negotiated contract between sophisticated parties in the oil and gas business that, you know, So if you did it before 180 days while the lease was still on, you could completely wipe them out and not worry about them one bit, right? I wouldn't say that, Your Honor. That's why courts do fiduciary duty, huh? Well, that would be in the context of an intentional surrender, which is not what happened here. I'll grant you it might be a closer case if Hess had taken these top leases and, you know, intentionally surrendered them the next day. Well, I'm talking about 181 days before the expiration. That's what you're arguing. Right. You can take the top lease 181 days before expiration, but then the subject lease is allowed to play out, and that's what happened here. As a matter of fact, the leases we're talking about as being excluded under this term were taken 497 to 610 days before, and Hess then allowed the leases to play out and actually drilled on a number of the leases, you know, at issue. And I think it's perfectly reasonable for the parties to negotiate a term like that, understanding that a lessee may take top leases a long ways out as a risk mitigation issue, not in order to perform some sort of intentional washout. What you're really concerned about are those, you know, those few days, those few weeks, maybe a few months around the expiration date where a lessee might alter their drilling schedule or something like that. And so in conclusion, we would ask, Hess would ask that this court affirm the district court. Thank you, Your Honor. Thank you, Mr. Forrester. Mr. Hoskins. May it please the court. My name is Brandon Hoskins. I'm here on behalf of the lone remaining appellant to wait to waive. I think I'd like to start by going back to an initial question by Judge Smith.  What did the district court do wrong? I think the district court ignored the admittedly scant bit of, I guess, reliable information from North Dakota Supreme Court. And that's the goal here is to do what the North Dakota Supreme Court would do. And that one case would be Sandvik. And Sandvik goes on to use other resources that I think that the court should also rely on because the North Dakota Supreme Court relied on those. And that would be the Pettex case from Kansas and the law that is related to that. And I think the Pettex case is important because Lily Bridge, which I believe is the main case relied on by Hess, is actually essentially. How do those cases, Sandvik and the others you cite, show that these should be extensions? Well, because, and I might just use the language here, Your Honor. Counsel, the key to those cases is the top leases were identical to the original leases, the subject leases. So if they're not identical, I think that's the paragraph before the site to Kansas. So you compare the terms, right? I disagree, Your Honor, and it says substantially identical. I think the terms that they are. They say nearly identical. Turn to Headnote West, and North Dakota uses that system, paragraph 17 and paragraph 18 of Sandvik. Oh, of Sandvik is what you're talking about. Yeah, Sandvik, yes, sir. And I'm actually referencing Reynolds. But, yes, in the dicta here, they do say that. I think the important parts to look at in that, though, and this is considered dicta. This was not a portion of the main decision in this. But considered dicta is what is expressed in what this Court has said we should look at when trying to discover what the North Dakota Supreme Court would do in this scenario. And they do cite the Pettex case and the Kuntz periodical, and they say it has been held that a new lease acquired from the lessor by the lessee, while the old lease is in effect, is an extension of the lease. And I think that's the simple meaning of that term within the industry, which, again, there's talk of extrinsic evidence being used by our side. And under the statutory language for contract interpretation in North Dakota, we're supposed to give a technical meaning to technical words. And this was, remember, a relationship between RME and the Stuber Group, where they agreed that the Stuber Group would go out, get these leases, and RME or its successors would then try to develop the minerals under those leases. So the extrinsic evidence is not standard parole evidence under a written agreement. It's simply describing the technical meaning of the terms as required by a North Dakota statute. Similarly, a North Dakota statute says that we should look at the circumstances under which the contract is made. And in this case, there was a relationship between those two parties when the overrides were given. And the majority of the consideration for the work done to go out and get all these leases so that RME or its successors could develop these minerals was overriding royalty interest. And that's why all these states like Kansas, which North Dakotas relied on, at least in DICTA, do imply a fiduciary duty. Was Mr. Forster accurate in his description of differences between the top leases and the existing leases? There are what we would consider small differences in essentially kind of the- You consider them to be material. I don't, Your Honor, for purposes of extensions and renewals. I think the only material terms are the minerals that are encumbered and the relationship of being able to develop those minerals. So the lessee, lessor relationship. And that's what RME was trying to get out of the Stuber Group was the ability to develop these minerals. Hess eventually, as a successor, obtained that same ability to develop the minerals, which was the consideration for overriding royalty interest. So Hess was put into that position. They got all the value out of that initial agreement. And by not paying the overriding royalty interest to the Stuber Group, based on their work done to obtain the leasehold interest here, they are essentially not paying their fair share under that agreement. I see my time's up. Unless there's another question, we'll rest on our briefs. I see none. Thank you, Mr. Hoskin.